In the

# United States Court of Appeals

### For the Seventh Circuit

No. 13-3648

JOYCE HUTCHENS,

*Plaintiff-Appellant,*

*v.*

CHICAGO BOARD OF EDUCATION and AMANDA RIVERA,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 7931 — **Edmond E. Chang**, *Judge.*

ARGUED MARCH 3, 2015 — DECIDED MARCH 24, 2015

Before POSNER, KANNE, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* Joyce Hutchens, the plaintiff in this suit charging racial discrimination in employment in violation of federal law, is a black woman. A large-scale layoff in the Chicago public schools system's Professional Development Unit, where she worked, required the unit to decide whether to retain her or a white woman, Deborah Glowacki, who Hutchens argues was less qualified than she and was retained in place of her only because the unit's director at the

time, defendant Amanda Rivera, preferred whites to blacks. The district judge granted summary judgment in favor of both defendants (the other defendant being the Chicago Board of Education) on the ground that they'd presented a justification for the replacement that was not merely a "pretext"—"deceit used to cover one's tracks." *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 730 (7th Cir. 2001).

Hutchens had been a "team leader" in the National Board Certification subunit of the Professional Development Unit. The subunit's job was to help teachers obtain National Board Certification, which "will distinguish you as an accomplished, effective teacher who has met the highest standards in the profession." National Board for Professional Teaching Standards, "Why Certify?" www.boardcertifiedteachers.org/about-certification/why-certify (visited March 17, 2015, as were the other websites cited in this opinion). After a reorganization of the Professional Development Unit, Hutchens was designated a "curriculum facilitator." She continued to assist candidates for National Board Certification (even though the National Board Certification subunit had been abolished in the reorganization), but now she also assisted inexperienced teachers. Her supervisor after the reorganization was Karen Cushing.

Glowacki was hired to be another curriculum facilitator in the Professional Development Unit; her duties were similar to Hutchens'. The two women have basically similar educational backgrounds, but somewhat different vocational backgrounds. Hutchens had taught in public high schools in Chicago for eleven years, the first five of them at Lincoln Park High School (an elite Chicago public school, see "Lincoln Park High School (Chicago)," *Wikipedia*, http://en.

wikipedia.org/wiki/Lincoln_Park_High_School_(Chicago)), from 1994 to 1999, and the last six of them at Consuella B. York Alternative High School from 2002 to 2008. York is a public high school administered by the Chicago Board of Education but located on the grounds of the Cook County Jail; the students are detainees of the jail aged 17 to 21. Cook County Sheriff's Office, *Programs and Services—Education*, www.cookcountysheriff.com/doc/doc_ProgramsAndService s.html.

Between 1999 and 2002 (the interval between her two teaching stints), Hutchens owned and operated her own firm, JDH Training & Communications Group, offering training in "life skills" to professionals and corporations. In that capacity she was one of three women to receive a Hall of Fame Award from the Women's Business Development Center. See Chinta Strausberg, "Entrepreneurial Summit for Women Slated," *Chicago Defender*, Sept. 7, 2000. She testified that she returned to teaching because she missed the students. The record does not make clear why upon her return to teaching she was assigned to York, though we offer a conjecture later.

As for Glowacki's teaching career, she testified that she had taught second through seventh grades at St. Gabriel's Elementary School (a Catholic parochial school) for four years and then fifth through eighth grades at St. Simons Catholic School for three years. She didn't indicate the dates of these teaching stints but testified that her "next job" was teaching at McClellan Elementary School, a Chicago public school, beginning in 1997 or 1998. She further testified that upon going to work for the public school system she had been given two years of credit for her time teaching in the

parochial schools. For unexplained reasons her annual salary in the Professional  Development Unit exceeded Hutchens' by almost $7,000 even though both had the same jobs in the unit and had been employed by the Chicago public school system for roughly the same length of time. There is no evidence that the "credit" that Glowacki received when she began working for the public school system accounted either for her higher salary or for her rather than Hutchens being retained by the Professional Development Unit rather than laid off.

Glowacki was hired by the Professional Development Unit in January 2009, eight months after Hutchens. In April of that year Alan Anderson, of the Board of Education's Department of Human Resources, was instructed to reorganize the unit. As part of the reorganization both Hutchens' and Glowacki's jobs were abolished and in June the two of them were placed on the layoff list. But later that month, before the layoffs were implemented, Anderson removed Glowacki but not Hutchens from the list and so Hutchens was laid off and Glowacki retained. After receiving a right to sue letter from the EEOC, Hutchens brought this suit.

Other employees in the Professional Development Unit were laid off besides her, but it appears that either Glowacki or Hutchens was going to be retained and the suit charges that Glowacki was retained instead of Hutchens because of her race. The credentials and experience of the two women were similar, but since Hutchens had been employed in the Professional Development Unit longer than Glowacki one might have expected Glowacki to be laid off rather than Hutchens unless Glowacki was the better worker. A reasonable jury could also have found that Hutchens had a strong-

er resumé than Glowacki, given the standing of the Lincoln Park school and the challenge of teaching jail detainees. And there was more: Hutchens had two master's degrees (journalism in 1987 and education in 1997), while Glowacki had only one (in a combined teaching and leadership program; she didn't indicate the year). Hutchens had 12 additional graduate-level hours in education, and Glowacki did not testify that she had any continuing-education credits. Both were National Board Certified but Hutchens was certified to teach high school English and journalism and middle school language arts, business education, marketing, and management, while Glowacki testified to no certification other than the National Board. An article in the May 15, 2007 edition of the *Chicago Sun-Times* entitled "These Educators Have Something to Teach Us All" discusses the five Chicago public school teachers who had just won the "Unilever Performance Plus Award" by going to "extraordinary lengths to make a difference in their students' lives." Hutchens, but not Glowacki, is named as one the recipients of the award. The article states that while at York she had "developed an entrepreneurial training program that teaches students skills needed to start a business."

It's true that Rivera had hired Hutchens, and true too that while Glowacki is Polish-American (Glowacki is a Polish name—if you doubt this, Google the name) and therefore white, Rivera is Puerto Rican. But according to the 2000 Census more than 80 percent of Puerto Ricans consider themselves white and only 8 percent black. See "Racism in Puerto Rico," *Wikipedia*, http://en.wikipedia.org/wiki/Racism _in_Puerto_Rico#Contemporary_Demographics. Rivera in any event is white. See LSNA (Logan Square Neighborhood Association), Issues and Programs, "Rivera, Amanda" (pho-

tograph),    www.lsna.net/Issues-and-programs/Events/50th-Anniversary/Issues-and-programs/Events/Rivera-Amanda.html.

Having hired Glowacki, Rivera had to choose between the black woman she had hired and the white woman she had hired and she may have picked the white woman on racial grounds in the face of that woman's seemingly inferior credentials. The question is whether a reasonable jury could so find on the basis of the evidence submitted in pretrial discovery. If so, summary judgment should not have been granted in favor of the defendants.

Anderson submitted a declaration to the EEOC in which he said that he'd decided to retain Glowacki because she had "previously supported" and was "knowledgeable in the National Board Certification program," whereas Hutchens, he said, "was not supporting" and "was not as knowledgeable in the National Board Certification program." That was a strange thing to say, given that Hutchens had been hired by the unit that was responsible for that program before Glowacki. In fact Anderson was misled. He had discussed layoffs with Rivera (who remember was the director of the Professional Development Unit), and she had recommended that Glowacki not be laid off (yet without saying anything about Glowacki's background or qualifications) and had failed even to mention Hutchens, let alone say anything about her background and qualifications.

Thus in picking Glowacki to survive the cut, Anderson was acting on incomplete information furnished by Rivera. In his deposition Anderson acknowledged that he hadn't known that Hutchens had a National Board Certification—let alone that she'd received it a year before Glowacki had—

and further acknowledged that it "would have been useful" to him to have known that. He testified without contradiction that he had never met or even heard of Hutchens even though the Professional Development Unit, where she worked, was part of the Department of Human Resources, where he worked.

The district judge acknowledged that this "one particular fact [Hutchens' earlier receipt of the National Board Certification] would have been helpful [to Anderson] in deciding which employee to retain," but decided that its "significance … paled in comparison to Hutchens's performance problems." We'll see that the evidence that she had such problems was weak, heavily contested, and possibly fabricated— as the judge failed to note.

Anderson further testified that he "absolutely" would have considered, had he known about, emails to and from coworkers of Hutchens indicating that right up until she was laid off she was working cooperatively with her coworkers.

Not only was Anderson's decision in favor of Glowacki based on misinformation given him by Rivera, but he admitted that his declaration to the EEOC that we mentioned had been prepared by the Board of Education's counsel and had been based not on Anderson's personal knowledge but instead on information supplied by Rivera. She was therefore the key witness for the Board, as well as for herself as the Board's codefendant.

She testified in her deposition that she had preferred Glowacki to Hutchens because she thought the former better able to "sell the program and recruit, build relationships, establish rapport, [and] work in collaboration." She testified

that Hutchens "isolated herself" during meetings and didn't volunteer to do "anything extra."

Cushing, who remember was Hutchens' and Glowacki's supervisor, was also deposed and she testified that Hutchens exhibited poor "interpersonal skills," was "pretty withdrawn from working" (whatever that means), wasn't interested in working "with other people," and "should have known" more than she did but "appeared to not be interested in learning how to do more things," that she had "poor tech skills" and her work "needed more editing" than Glowacki's did and that in evaluating the performance of the two in 2009 Cushing had rated Hutchens as having "partially met expectations" but Glowacki as having "met and exceeded" expectations. Presumably the performance evaluations were written, yet no written evaluations were submitted in discovery (despite which the district judge referred to Glowacki's "comparatively superior performance evaluations"). Cushing thought the evaluations had been destroyed. Hutchens in her deposition denied having seen an evaluation of herself in 2009 and stated that she was not aware of having been formally evaluated.

Another employee, Lily McDonagh, who was Hutchens' supervisor between July and November 2008 (before Glowacki was hired), testified that Timothy Jackson, another employee whom she supervised, complained to her once about "constant bickering" among four other employees, including Hutchens. McDonagh first testified that Hutchens, Carla Vides, and Tabita Sherfinski, as well as Jackson, had all complained about the bickering but later said that Vides and Sherfinski, although they had made some other com-

plaints about Hutchens, had not accused her of bickering. Nor had Yvonne Williams, another member of the unit.

Rivera, Vides, Hutchens, Sherfinski, Jackson, and Williams are all listed as "organizers" on a document Hutchens submitted in discovery called "Unity 2008: Increasing NBCTs [National Board Certified Teachers] of Color for a Diverse Student Population: Proposal to Recruit and Increase the Number of Minority National Board Certified Teachers in the Chicago Public Schools." So the unit was able to collaborate successfully on a project that Hutchens had spearheaded. That project tended also to refute testimony by Rivera and Cushing that Hutchens failed to take initiative on projects, since Unity 2008 was her project. Cushing also acknowledged that Hutchens was very interested in developing strategies to recruit more minority teachers for National Board Certification; the Unity 2008 document emphasizes (at page 4) the racially uneven distribution of National Board Certifications among teachers in Chicago public schools.

Asked at her deposition whether there was any "documentation" of the alleged bickering, McDonagh said no and explained that "documentation wouldn't have been required because it wasn't—there was nothing egregious. It wasn't at the point of discipline. So it was more about an advisory role and working to get them to be more collaborative with one another." Neither McDonagh nor any other witness explained what the bickering was about. McDonagh did testify that when she asked Hutchens about it Hutchens had told her "that she was not going to get involved," "that she was embarrassed that [McDonagh had] been apprised of what was occurring because it was not her style," "that she was

not going to be a party to this. That this was between the other people on the team and she was going to rise above it." The team worked in one room, so doubtless there was a lot of chatter some of which could be characterized as bickering.

An odd feature of the bickering issue is that McDonagh did not herself observe bickering; she just listened to complaints about it, apparently making no effort to evaluate the accuracy of the complaints. Hers was thus not the best evidence—in fact was mainly hearsay. Vides, Sherfinski, and Williams also testified. Vides tried to place the bickering issue in perspective by pointing out that "we had a room filled with chiefs, and we didn't have any Indians. … [B]eing that we were all team leads and then me having to tell team leads what to do and I was equal to them, that was the point of contention within the office. So it wasn't so much that we didn't get along because we were all so difficult. We were all leaders and we all, literally, had leadership skills and personalities; and so there was, you know, there was bumping of heads, you know, especially like I said if I had to tell people what to do[,] and I had the same title."

Vides further testified that Hutchens had a "strong understanding" of the National Board Certification program, was an "effective collaborator with work colleagues," and had "strong writing skills. … [S]he had said that she was a journalist; and then she was always asked to write the talking points for Arne Duncan [former CEO of the Chicago public school system, now U.S. Secretary of Education]. And then I [Vides] would always have [Hutchens] edit my work."

Sherfinski didn't testify about bickering, but said that both Vides and Hutchens were "difficult to work with," Hutchens because "she was focused on certain tasks that she wanted to accomplish, but at least I found her willing to help with the work that needed to be done." Sherfinski later worked with both Hutchens and Glowacki. She testified that Hutchens and Glowacki knew "just as much about National Board, which was far less than what I knew." Sherfinski also said that Glowacki was "willing to work" but that Hutchens was "checked out," based on her "body language"—she "leans back; she's closed off; she's [*sic*] gets a fierce look in her face." Sherfinski added that Hutchens had "a scowl that means stay away" and was "very, very irritable," though she acknowledged that it was a "good thing" that Hutchens wanted to get more minority teachers National Board Certified.

Williams, on the other hand, testified that Hutchens "got along with people" but would ask Sherfinski to turn her music down, since they were all in one big room; obviously there was no love lost between Hutchens and Sherfinski. Williams also said that Hutchens "communicated with everyone" and "worked well" with her, Vides, and Jackson. She testified that Hutchens "would initiate" birthday celebrations for the members of the team—"something she enjoyed doing was celebrating people's birthdays. … She communicated with everyone. She helped people when they came into the facility. She worked well with me. … I've never seen her, you know, kind of be mean to people or standoffish." There was much else in this vein.

Rivera testified that she had known about "issues with tardiness [of Hutchens]." But she did not say how or from

whom she had acquired this knowledge. She did not name a single person who had informed her about Hutchens' alleged tardiness, though they would have been Rivera's own subordinates. She referred to a chart that she said showed absences and tardiness by Hutchens, but the chart was not placed in the record. There were references to lost documents that if they had still existed would, the defense witnesses testified, corroborate Rivera's and Cushing's testimony. A reasonable jury might well be skeptical of such a claim.

Cushing testified that on one occasion she had to speak to Hutchens about several late arrivals (by Hutchens) at work. But she conceded that she had been "satisfied" that most of the suspected "tardies" were false alarms because they referred to times at which Hutchens had been working on public school business that required her to be out of her office. Cushing further testified that she thought she recalled seeing Hutchens sleeping during a training session but "couldn't tell you for sure," while Rivera testified that members of her staff had told her that Hutchens was sleeping at work (more hearsay). Yet neither Rivera nor Cushing ever disciplined Hutchens for sleeping during work or even mentioned the subject to her. The judge said that Cushing "knew for sure" that Hutchens' "eyes were closed and that Hutchens was not engaged in the training." But the judge added that Cushing had "conceded that she could not *definitely* say that Hutchens was in fact in a state of sleep" and indeed he scoffed at the idea that she could have known that.

The defense claimed that Rivera knew that Hutchens sometimes failed to follow through on work assignments that she was given. But Rivera testified that it was not she

who knew this, but Cushing—but Cushing did not testify to it.

The record contains a rave letter of recommendation that Cushing had written for Hutchens, who having just been laid off was looking for another job. Of course letters of recommendation for laid-off employees tend to exaggerate, yet Cushing testified that the letter was "mostly" true, except when it said that Hutchens "willingly accept[s] new challenges" was a "stretch." The judge said that the "letter was no different than one Cushing would give to anyone in the [Professional Development] Unit who asked for one." We can't find the basis for this statement, and it's almost certainly false, given certain details in the letter, attested as true by Cushing, that (except for the last one) would not have applied to everyone in the unit: that Hutchens "wrote many of the articles publicizing the program and events" (the "program" is presumably the program of the unit); "in addition to her writing talents, she has also supported recruitment of NBC [National Board Certification] candidates by presenting information sessions around the city," "presented trainings for lead mentors and mentors in the GOLDEN Teachers program as well as those for the CPS Excellence in Teaching pilot program," "is well regarded as a facilitator of professional development by her audiences," and "is conscientious and dependable." Cushing did say that she "made the offer [to write a letter of reference] to all the people who worked for me that if they needed a letter of reference that I would provide one," but she didn't say that she wrote the identical letter for everyone.

And remember Cushing's testimony about Hutchens' need for editing? That testimony was in tension not only

with Vides' testimony but also with Cushing's having re-
ferred twice, in parts of the letter of recommendation that
she did not call a "stretch," to Hutchens' "writing talents,"
adding that Hutchens' "writing talents are an asset." Hutch-
ens appeared pro se in this appeal. Whether because of, or in
spite of, not being a lawyer, her two briefs—opening and re-
ply—are indeed well written.

Besides the letter of recommendation and her denial that
she had received a formal evaluation, Hutchens presented
emails by her coworkers to her which indicated that she was
cooperative and her work for the Professional Development
Unit good.

Remarkably in light of our summary of the record, the
district judge, in granting summary judgment said that the
honesty of the defendants' beliefs about the relative qualities
of Hutchens and Glowacki could not reasonably be ques-
tioned. In fact, as our summary of the evidence reveals, there
is considerable doubt about the honesty of Rivera and Cush-
ing, the main witnesses for the defense, and Sherfinski, who
seems to have had a private quarrel with Hutchens over the
loudness of the music in the room in which they both
worked. Anderson was just a cat's paw of Rivera, Vides' tes-
timony was on the whole favorable to Hutchens—Williams's
even more so—and McDonagh's testimony was hearsay.

The district judge remarked that Anderson is black, as if
to imply that Anderson's decision to lay off Hutchens rather
than Glowacki could not have been discriminatory. In fact
Anderson had never met Hutchens, and there is nothing to
suggest that he knew her race. Moreover, he was as we said
a cat's paw, which is to say an unknowing tool of Rivera.
See, e.g., *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012). He

based his decision to retain Glowacki rather than Hutchens (despite the latter's greater seniority and apparently superior credentials) on what Rivera told him—and as she did not mention Hutchens he had no alternative to retaining Glowacki, which automatically terminated Hutchens.

The judge said that Hutchens' having taught at a "prison school" made her less qualified for a professional-development position than Glowacki. There is no reason, let alone evidence, for such a conclusion. The "prison school" in Cook County Jail is a public high school administered by the Board of Education. It differs from other public high schools mainly in the average age and composition of its student body. It must be tough to teach, year after year, inmates many of whom are older than most high school seniors (for remember that the students at York range in age from 17 to 21). The district judge thought it a significant point in favor of the defendants that only 1 percent of Chicago's public schools are "prison schools," and that therefore Hutchens couldn't have been familiar with the Professional Development Unit. But she had been hired into that unit with knowledge of her background, which included not only her time at the "prison school" but also five years of teaching at one of Chicago's very best public high schools. The nature, and significance for the professional-development job, of Glowacki's parochial school and public elementary school careers, were not explored at all. (Of course, zero percent of public schools in Chicago are parochial schools.)

The judge did not remark the surprising fact that the defendants failed to submit a single document that might have corroborated any of the testimony of Rivera or Cushing—testimony, riddled with unreliable hearsay (not all hearsay is

unreliable, but this hearsay is), that needed documentary backup. Instead the judge summed up his take on the case by stating that "What is clear is that Defendants honestly believed that Glowacki was the better employee." What is clear is that this was the decision-maker's belief—Anderson's—since Glowacki was the only candidate offered to him (as in a Soviet election). What is unclear is whether he based the decision on the honest beliefs of Rivera or on dishonest beliefs, and whether the testimony given by Rivera and Cushing in their depositions had any significant truth value at all.

A reasonable jury could credit Hutchens' evidence while rejecting Rivera's and Cushing's, and impressed by Hutchens' credentials, her seniority over Glowacki, her earlier receipt of National Board Certification, her other credentials superior to Glowacki's, her writing skills, and her toughness in teaching inmates of Cook County Jail year after year, could conclude that she was better qualified for the job than Glowacki. It's true that having found all these facts in favor of Hutchens, that reasonable jury might nevertheless deem Hutchens a victim not of racism but of error, ineptitude, carelessness, or personal like or dislike, unrelated to race. Certainly the Professional Development Unit seems to have been poorly managed, with little effort at recordkeeping despite the befuddled recollections of key members of the unit; Hutchens may have been a victim of incompetence rather than of racism.

But equally (so far as one can judge from a record limited to evidence obtained in pretrial discovery) a reasonable jury might deem Rivera's and Cushing's testimony a tissue of lies (the polite term is "pretext"), Hutchens distinctly better qualified for retention than Glowacki (about whom the rec-

ord contains little information), and the latter's being retained instead of Hutchens a consequence (for why else all the lies?) of a preference for a person of the same race, by the persons who testified against Hutchens. See *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) ("shifting explanations" for an adverse employment action may give rise to an inference of pretext); *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 651 (6th Cir. 2012) (jury could reasonably disbelieve an employer's explanation for a decision inconsistent with the employer's prior conduct); *Vaughn v. Woodforest Bank*, 665 F.3d 632, 638–40 (5th Cir. 2011) (an employee can create a litigable issue by submitting evidence that disputes the employer's charge of "unsatisfactory conduct"); *Holcomb v. Iona College*, 521 F.3d 130, 141–44 (2d Cir. 2008) (a reasonable jury could choose among several possible motives when weighing evidence for and against alleged discrimination). The district judge himself, by emphasizing his belief that the defendants' witnesses had been "honest," implied correctly that if they were liars a reasonable jury could conclude that Hutchens' race had been a decisive factor in the decision to prefer Glowacki over her. But these are factual issues for a jury to resolve.

The district court's judgment as to Count II, alleging racial discrimination in violation of 42 U.S.C. § 1983, and Count III, alleging racial discrimination in violation of Title VII, is reversed and the case remanded for trial on those counts. The district court's dismissal of the other counts is uncontested, and is affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.